FALDA M. RUFFRIDGE, petitioner,

*v.*

CORNELIA BIRD RUFFRIDGE et al., defendants.

[Submitted May 3d, 1924. Decided May 24th, 1924.]

**Divorce—Adultery—Counter-claim Extreme Cruelty—Evidence Examined, Petition Dismissed.**

On petition, &c.

*Messrs. Harrison & Roche,* for the petitioner.

*Messrs. Lum, Tamblyn & Colyer* and *Mrs. George R. Beach,* for the defendants.

*Messrs. Congleton, Stallman & Hoover,* for the intervening defendant, Robert H. Spahn.

FOSTER, V. C.

Petitioner seeks a divorce on the ground of adultery. Defendant's answer denies all the charges of the petition, and by her cross-petition she asks a divorce on the ground of extreme cruelty, and petitioner in his answer to the cross-petitional denies all of the charges made against him.

The jurisdictional facts of the marriage of the parties on February 18th, 1922, and of their residence in Montclair, in this state, have been duly proven.

On February 23d, 1923, the parties separated, Mrs. Ruffridge moving to the home of her parents, in Montclair, where she has since resided.

Petitioner is about thirty-two years old and his wife is about ten years younger.

Some days before the separation the parties had quarreled because petitioner found that defendant had broken her promise to give up the use of lip-sticks and cosmetics, and she had told him that she would do as she pleased, and that his ideas were mid-Victorian. According to petitioner's proof the parties had lived happily up to the separation; they had an attractive home and he made her a suitable financial allowance for her own and for household expenses. After the above-mentioned quarrel they made up, and, apparently, were living amicably, when, without the slightest notice, she left him, leaving a note in the apartment which reads: "My dear Falda—I have thought very seriously of our life together, and I have found I connot go on any longer because of your extreme cruelty to me. I am leaving you and shall take steps to obtain a divorce." (Signed), "Connie."

The defendant first met the co-respondent Spahn (who is a married man living apart from his wife and children), in October, 1922, in connection with the purchase of a piano. Spahn is a piano salesman in the employ of the Griffith Piano Company in Newark. In January, 1923, Spahn again met defendant and her father in connection with the piano purchase and on subsequent occasions, and in March, 1923, after the parties had separated, Mr. Bird, defendant's father, invited Spahn to call at his home while he (Bird) was absent

in Europe, "to help in a way to look after the women of his family," so that Spahn's relations with defendant and her father's family gradually changed from a business to a social one. During the period mentioned in the petition, Mr. Bird's family consisted of himself and wife, a son at college, two young children, the defendant Miss Zourabouf, who acted as a companion or governess, three maids and a chauffeur.

Spahn appears to have actively accepted Mr. Bird's invitation, and he made frequent calls at the home on an average of more than twice a week from April 15th, until the departure of the family in June for their summer home in Connecticut.

In his bill of particulars petitioner states that the acts of adultery charged in his petition were committed by defendants on April 29th, May 7th, May 9th and May 23d, all in the year 1923, and on other dates between April 15th, 1923, and July 15th, 1923; defendants manifested affection for each other.

Taking petitioner's proof relating to these dates in their chronological order, and he relates the details of each occurrence after reference to a memorandum book, the record is: That on April 15th, about eleven P. M., petitioner saw a Studebaker car in the driveway at Bird's house. He looked under a curtain of the living-room, which was raised about six inches, and saw his wife sitting on a davenport, with her legs exposed above her knees; Spahn was sitting by her with his arm around her and his left hand on her knee, and his face down and against her neck. Petitioner is without any corroboration of the facts he testifies to as having occurred on this date.

This incident and conduct is denied by both defendants, and Spahn also shows that he never drove a Studebaker car, and Mrs. Bird testified her daughter was never alone with Spahn.

The next date to which petitioner's proof relates is fixed by him and his witness, Dr. Crane, as April 19th or 21st. Petitioner states that by again looking under the curtain, about eleven P. M., he again saw his wife on the davenport with

her legs exposed above the knees; that Spahn put his hand on her left leg; that he identified her by her legs, which are peculiar, from a large ankle bone, and that the contour of her leg is curved there.

Dr. Crane corroborates petitioner, by stating he also looked under the curtain, saw the woman's legs exposed, did not see the face of the man or woman, although he watched for about twenty minutes. He is pretty sure the woman was Mrs. Ruffridge, as he states he has seen her in bathing suits and around the house, and can therefore recognize a good part of her. This incident and conduct is also denied by both defendants and by Mrs. Bird, and it also appears that Mrs. Bird was at home that night, and that Spahn had taken Miss Zourabouf to see a moving picture, and that on their return home they passed within a few feet of petitioner and recognized him and knew he was watching the house. Petitioner states it was Mrs. Bird, and not Miss Zourabouf whom he saw being escorted to her home by a strange man.

The next, and the most important date in petitioner's case, is April 29th. Petitioner states that on this night, about ten or ten-thirty, accompanied by Dr. Crane, he found a curtain in the solarium of the Bird house raised about an inch or an inch and a half, and through this aperture he saw his wife lying on the davenport in the living-room, a distance of fifteen or twenty feet from the window where he and Crane stood; her dress was pulled up just below her hips; he recognized her by her legs; Spahn was seated by and leaning over her; he could see her legs bending up, flexing at the knee, straightening out, twisting from right to left, and could see the man's back moving. He and Crane watched this for about ten minutes, then she arose, pulled down her dresses and adjusted her sash, and in a few minutes she again laid down with her head to the other end of the davenport; the man then came in sight and laid down beside her and partially on her; he and Crane watched this for five or six minutes and discussed what he should do; he

then left and telephoned his counsel, who advised him to get another witness; he did so, and returned in a short time with Mr. Broom; he then resumed his observation, and states he again saw the defendants engaged in the same conduct, and, finally, they sat up and kissed each other. He and Crane and Broom waited until the man left, about eleven or eleven-thirty P. M., and followed him and recognized him as Spahn.

Dr. Crane and his wife were quite intimate friends of Mr. and Mrs. Ruffridge prior to their separation.

Dr. Crane testifies that at petitioner's request he helped him watch the defendant's and Bird's home on April 19th and on subsequent dates. He states that he saw a man and woman on the couch in the living-room on the night of April 29th. After petitioner left to consult counsel, Crane continued to watch at the window; he saw the woman sit up and take down one of her bloomer legs, then she lay back on the couch with Spahn ontop of her; she nearly fell to the floor, and they lay partly on the couch and partly on the floor for five or ten minutes; he could see her bare leg nearly to her hips. They had intercourse while he was looking at them. They laid down three times, and it was the third time, while petitioner was absent, that the act of adultery was committed. He adds that the light in the living-room where defendants were lying had been extinguished, and he was able to see what he did by the illumination furnished from a light in the hall adjoining the living-room. Mr. Broom, whom petitioner summoned as a witness that night, and his wife, had also been intimate friends of Mr. and Mrs. Ruffridge until the separation. Mr. Broom states he reached the Bird home about eleven P. M.; he looked through a slight opening in the curtains on one of the windows in the solarium and saw as much of the couch in the living-room as the doors would permit; he saw a man lying on the couch, with a woman's bare arm moving back and forth on his back, and could not see anything of the woman except her arm. When they moved around or sat up he could not distinguish who they were; he thinks their bodies were cov-

ered, otherwise he could have seen very distinctly. The living-room was not distinctly lighted. "It was lighted in such a fashion I could distinguish figures, but I couldn't tell who they were." He further testified that he did not see any act of adultery committed by the defendants on this nor on any other occasion, and that he had never seen Spahn. Mr. Broom states that he and petitioner were looking together. "Crane, I don't think he looked—I don't know."

The defendants not only deny each and every feature of petitioner's case relating to this particular date, but by a clear preponderance of the evidence they show that on the night in question they, in company with Mrs. Bird and Miss Zourabouf, attended a meeting on the league of nations at the Montclair Theatre, which lasted from about eight to about eleven o'clock. They are corroborated in this by at least one disinterested witness, Mr. Wood, who called at the home that night and was informed by a maid that the family were at church. The witnesses for defendants testify that this was a very lengthy meeting, which ended about eleven P. M.; that after the meeting Spahn purchased ice cream and they took it home, and that the party ate it in the dining-room about the hour petitioner and Dr. Crane states the act of adultery was committed. The manager of the ice cream store testified that the meeting that night did not last as late as eleven P. M.

Petitioner's next charge relates to May 7th, when he states that in looking under a curtain in the living-room he saw his wife lying on a davenport with a man lying down beside and partly on her, covering her legs; that he could only see her shoes and the man's legs on top of hers; that her dress was pulled up above her knees and he recognized her by her legs. Dr. Crane, who was watching with petitioner on this occasion, states Mrs. Ruffridge was lying down with her legs exposed and that Spahn was walking about. This is also completely denied by the defendants.

On May 9th petitioner states he looked under a curtain in the solarium and saw Mrs. Bird reading in front of the fireplace and heard her say, "Connie, is it all right for me to

come in?" That thereupon the defendants came from the living-room into the solarium and Mrs. Bird went out; that defendants put out the light, ate some candy and went back into the living-room, carefully drawing the portières so that nothing could be seen. Dr. Crane at first corroborated petitioner and testified that Mrs. Bird said, "Can I come in, Cornelia;" later he admitted that he did not hear her say this.

This whole incident is denied by the defendants and by Mrs. Bird.

On May 23d, petitioner states that about ten-fifty P. M. he and Crane saw Mrs. Ruffridge lying on a couch in the solarium, with her hair down, and Spahn was sitting by her. Dr. Crane states Spahn was sitting or lying over her.

These occurrences are denied by the defendants and their witnesses; and it appears that on this night Miss Zouraboff had returned from the hospital and that defendants and Miss Britton sat upstairs in her room until about ten-thirty; that when Spahn came down to go home he was accompanied by Mrs. Ruffridge; that she discovered her husband looking in one of the windows and telephoned for the police.

It also appears that Mrs. Ruffridge some time in April discovered that she was being followed by her husband and witnesses and that the Bird home was being watched by them, and she or Mrs. Bird complained to the police of this surveillance.

These are substantially the proofs relied on to establish the allegations of the petition. And from their recital it is apparent that petitioner and his principal witnesses, Crane and Broom, did not on the same occurrences on any of the dates mentioned. And as stated, petitioner is without any corroboration respecting what he states happened on April 15th.

Notwithstanding petitioner's memorandum relates to April 19th, he corrects this and states that the date should be April 21st, and he and Dr. Crane state that on this date, although they did not see the faces of the man and woman, that the defendants were engaged in improper conduct. He and

Crane identify them on this night as the defendant by the contour and general appearance of her legs. Petitioner and Crane and Broom contradict each other about the occurrences on April 29th, the only occasion on which direct proof is offered to show the adultery. Petitioner states that he and Crane together watched defendants in the act of adultery for about ten mintes; that when they changed their position on the davenport he and Crane again watched them for five or six minutes, and he then left to consult counsel and to get Broom as a witness. Crane contradicts petitioner, and states that the defendants laid on the davenport three different times, and that it was the last time, while petitioner was absent, that they committed adultery.

Broom contradicts both petitioner and Crane, and, although he knew Mrs. Ruffridge very well, he states that when he and Ruffridge looked together they could see only part of a couch and a woman's arms moving back and forth on a man's back; that they apparently were covered; that the light was so indistinct he could not distinguish who they were; that no act of adultery was committed while he and petitioner were watching, and that he does not know, but does not think, Crane looked.

Petitioner describes in detail how the act of adultery was committed when he and Crane first saw the parties on the couch and before he left to get Broom.

Crane states the act of adultery was not committed as petitioner states, but was committed the third time the parties laid upon the couch, and while petitioner was absent and before he returned with Broom; Broom states the parties were still upon the couch when he and petitioner together began their observations, that no act of adultery was committed, and that if it had been the light was so indistinct and the position of the couch made it impossible to recognize the parties engaged in it.

With these contradictory statements in mind, and the uncertain and unsatisfactory identification of the defendants, as the participants in these alleged adulterous relations, coupled with the extreme improbability that the acts charged

27

were or could be committed openly in the living-room of a home occupied at the time by eight or more people, and at times when the defendants knew they were being watched by petitioner and his witnesses, and giving consideration to the petitioner's insinuation, which, I do not believe, that Mrs. Bird and Miss Zourobouff connived at or encouraged the illicit relations between the defendants, I am unable to find in the record any satisfactory and convincing proof of defendants' guilt, and I will advise that the petition be dismissed.

With respect to the allegations of cruelty set forth in the. cross-petition, there is not the slightest proof, aside from the testimony of Mrs. Ruffridge, to support them; she is without any corroboration on any or all of her .charges, except as to the fact that she had a discoloration on her leg, and that her dress and some other articles were torn. Mr. Ruffridge made a complete and satisfactory denial of all her charges, and I will also advise that the cross-petition be dismissed.